**AGF MARINE AVIATION & TRANSPORT, Plaintiff**

**v.**

**RICHARD C. CASSIN, Defendant, CIT GROUP/SALES FINANCING, INC., and UNITED STATES OF AMERICA SMALL BUSINESS ADMINISTRATION, Intervenors.**

Civil No. 2001-49

District Court of the Virgin Islands

Division of St. Thomas and St. John

January 22, 2007

 

GEORGE H. HODGE, JR., ESQ., *For the Plaintiff.*

MICHAEL A. JOSEPH, ESQ., *For the Defendant.*

JOYCELYN HEWLETT, AUSA, *For the Intervenor United States of America Small Business Administration.*

CAROL G. HURST, ESQ., *For the Intervenor CIT Group/Sales Financing, Inc.*

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(January 22, 2007)

This is an action brought by AGF Marine Aviation & Transport ("AGF") to void a marine insurance policy held by Defendant Richard Cassin ("Cassin"). The policy covered a yacht owned by Cassin which sunk off the coast of Grenada. Citi Group/Sales Financing, Inc. ("CIT"), was granted leave to intervene in this action in October, 2001, as a first priority lienholder on the vessel. The United States Small Business Administration ("SBA") was granted leave to intervene in May, 2002, as a second priority lienholder. (The Court will refer to CIT and the SBA collectively as the "Intervenors").

Before the Court are AGF's motion for summary judgment and Cassin's motion to allow an out-of-time opposition to AGF's motion. For the reasons stated below, the Court will grant both motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1997, Cassin obtained financing from CIT in the amount of $400,000 to purchase a vessel called the SV Falcon (the "Falcon"), an 85 foot pilot-house Formosa Ketch, from Magnus Falk ("Falk"). Cassin offered no further monetary consideration to purchase the Falcon. Falk accepted Cassin's offer, and in December, 1997, Cassin tendered $400,000 to Falk, through his broker, Robert Carson ("Carson") of Southern Trades Yacht & Ship Brokers, Inc. ("Southern Trades") and purchased the Falcon.

In March, 2000, Cassin submitted an insurance application to AGF for the purpose of obtaining marine insurance for the Falcon. Cassin submitted the application to AGF through his underwriting agent, TL Dallas (Special Risks) Ltd. of Bradford, England ("TL Dallas").

Under the section of the application calling for the "purchase price" of the Falcon, Cassin entered "$600,000." After receiving the application, AGF issued a marine insurance policy to Cassin, Policy No. 200/533/27383 (the "Policy"), in the amount of $600,000. The Policy covered the Falcon from April 1, 2000, to April 1, 2001. Section twelve of the Policy stated that the insuring agreement would be subject to the "well established entrenched principles and precedents of substantive United States Federal Admiralty law." Policy § 12. However, issues not encompassed by such well established, entrenched, federal admiralty law, would be subject to the "substantive laws of the state of New York." *Id.*

In November, 2000, the Falcon sunk off the coast of Grenada after colliding with a submerged shipping container. Cassin subsequently filed a claim on the Policy.

AGF thereafter filed this action seeking a declaration from this Court that the Policy is void *ab initio*. AGF contends that while investigating whether to honor the Policy after Cassin submitted his claim, it discovered facts regarding the purchase price of the Falcon that were allegedly misrepresented by Cassin on his application. Specifically, AGF asserts that it learned that the purchase price for the Falcon was actually $400,000.

AGF filed this motion for summary judgment on July 29, 2004. Cassin did not file his opposition to AGF's motion until March 9, 2006, nearly

two years later. Cassin also moved to file an out-of-time response to AGF's motion for summary judgment on March 29, 2006.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment will be granted only if "the pleadings, depositions, answer to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if its existence or nonexistence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249.

The movant has the initial burden of showing there are no genuine issues of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). If the moving party carries its burden, the nonmoving party "may not rest upon the mere allegations or denials of his or her pleadings, but his or her response must set forth specific facts showing that there is a genuine issue for trial." *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 489 (3d Cir. 1994) (citations omitted). In making this determination, all reasonable inferences are drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255.

### B. Timing for a Responsive Pleading

■ If a party has failed to make a timely filing, Federal Rule of Civil Procedure 6(b) ("Rule 6(b)") permits a court, in its discretion, to extend the deadline upon a motion by the party showing that the delay was the result of "excusable neglect." FED. R. CIV. P. 6(b). In *Pioneer Investment Services Co. v. Brunswick Assoc.'s Ltd. P'ship,* the Supreme Court gave a broad construction to the phrase "excusable neglect" explaining that:

> it is clear that "excusable neglect" ... is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant.

*Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 392, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). In determining whether a party's delay constitutes "excusable neglect," it is appropriate to consider:

> the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395.

## C. *Uberrimae Fidei*

█ *Uberrimae fidei* is a duty of utmost good faith which requires that an insured "fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000). This duty to disclose "extends to those material facts not directly inquired into by the insurer." *Id.* Moreover, a material misstatement or omission on the policy application is grounds for voiding the policy. *Id.* at 1363.

█ A party's intent to conceal, or lack thereof, is irrelevant to the *uberrimae fidei* analysis. *See Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 (5th Cir. 1969) (noting that a material misrepresentation or omission voids a policy even if the failure arose from "mistake, accident, or forgetfulness"). The standard for whether a misrepresentation or omission voids an insurance policy is objective:

> whether a reasonable person in the insured's position would know that the particular fact is material. To be material, the fact must be something which would have controlled the underwriter's decision to accept the risk.

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986) (citations omitted). The insurer bears the burden of proving materiality. *Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1340 (9th Cir. 1986).

## D. Contract Interpretation

█ According to federal admiralty law, state law governs issues of contract interpretation in marine insurance policies. *Royal Ins. Co. of America v. Sportswear Group, LLC*, 85 F. Supp. 2d 275, 278 (S.D.N.Y.

2000) ("[T]he Court determines the scope and validity of the [marine insurance] policy provisions ... and the consequences of breaching them by looking to state law." (citations and quotations omitted)). Here, Cassin's provided that it would be subject to New York law where federal admiralty law did not apply. Accordingly, New York law will govern the contract interpretation issues in this case.

■ "Under New York law, insurance policies are interpreted as contracts." *Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 335-36 (S.D.N.Y. 2004). Where the provisions of an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning. *U.S. Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 492 N.E. 2d 1206, 1207, 501 N.Y.S.2d 790 (1986). Courts decide whether a writing is ambiguous as a matter of law. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). Whether a contract is ambiguous depends on whether the language at issue is capable of more than one meaning "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Riddell Sports v. Brooks*, 1997 U.S. Dist. LEXIS 4394, at *22 (S.D.N.Y. Jan. 8, 1997) (citations omitted).

### III. ANALYSIS

#### A. Cassin's Motion to File an Out-of-Time Opposition

■ It is undisputed that Cassin was proceeding with this matter *pro se* when AGF filed its motion for summary judgment on July 29, 2004. A party's *pro se* status is a factor that a court may consider when determining whether there has been excusable neglect. *See Iannace v. Rogers*, 2006 U.S. Dist. LEXIS 52429 (D.N.J. July 18, 2006) (considering a litigant's pro se status before finding excusable neglect and granting his motion for an extension of time).

■ Here, Cassin has set forth evidence that the delay in responding was due at least in part to AGF's request for mediation rather than any bad faith motivation by Cassin. The mediator's report was not submitted until December 27, 2005, and AGF's summary judgment motion had not been decided when Cassin filed his opposition. While the two-year delay

is extremely troubling, it did not prejudice AGF, CIT, or the SBA or substantially impact the judicial proceedings. The late filing of Cassin's opposition was excusable. *See George Harms Constr. Co. v. Chao*, 371 F.3d 156, 165 (3d Cir. 2004) ("Because the *Pioneer* factors of good faith, prejudice, efficient judicial administration, and control all weigh in favor of [the movant], it has sufficiently shown 'excusable neglect' ... .") Accordingly, the Court will grant Cassin's motion to file an out-of-time opposition. The Court will consider Cassin's opposition in ruling on AGF's motion for summary judgment.

## B. Choice of Law

As discussed above, the Policy's choice of law provision stated that:

> any dispute arising hereunder shall be adjudicated according to the well established entrenched principles and precedents of sub-stantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the state of New York.

Policy § 12.

The United States Supreme Court has stated that courts are to apply state law to maritime insurance contracts in the absence of an established federal admiralty rule. *Wilburn Boat Co. v. Fireman's Fund. Ins. Co.*, 348 U.S. 310, 314-16, 75 S. Ct. 368, 99 L. Ed. 337 (1955). While the Third Circuit has not determined whether the doctrine of *uberrimae fidei* is established federal admiralty law, the Second, Ninth and Eleventh Circuits have so held.[1] In contrast, only the Fifth Circuit has explicitly stated that "the *uberrimae fidei* doctrine is not 'entrenched federal precedent.'" *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 889 (5th Cir. 1991). Moreover, district courts in the Third, Fourth and Seventh Circuits have employed the doctrine of *uberrimae fidei* in the context of marine insurance contracts. *See, e.g., North American Specialty Ins. Co. v. Bader*, 58 F. Supp. 2d 493, (D.N.J. 1999); *Commercial Union Ins. Co.*

---

[1] *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000); *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222 n.1 (9th Cir. 1995) (holding that since both the federal admiralty rule and the California statue were the same, it was unnecessary to decide whether the result was under admiralty or California law); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986).

*v. Detyens Shipyard, Inc.*, 147 F. Supp. 2d 413 (D.S.C. 2001); *St. Paul Ins. Co. v. Great Lakes Turnings, Ltd.*, 829 F. Supp. 982 (N.D. Ill. 1993).

■ This Court agrees with those courts that have held that the doctrine of *uberrimae fidei* is entrenched federal precedent. Accordingly, the Court will apply this doctrine to the marine insurance policy in this case. In light of the choice of law provision included in the contract, the Policy will be subject to New York law in areas not governed by the doctrine of *uberrimae fidei*. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 187(1) (1971) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.").

## C. The Amount for Which the Falcon Was Purchased

As a threshold matter, the Court must determine the purchase price of the Falcon. *See, e.g., American Home Assurance Co. v. Masters' Ships Mgmt.*, 423 F. Supp. 2d 193, 221 (S.D.N.Y. 2006) ("The first question for the Court [in the *uberrimae fidei* analysis] is whether the defendants made a misstatement at all.").

AGF points to several undisputed facts to show that Cassin transferred $400,000 to Falk in exchange for the Falcon yet stated on his insurance application that the "purchase price" was $600,000. Cassin stated in his interrogatory responses that he obtained $400,000 to finance the Falcon and gave this money to Falk to buy the Falcon. The closing statement for the sale indicates that the "selling price" was $400,000. Trident (Cassin's underwriter) issued a check to Southern Trades (Falk's brokerage company) in the amount of $400,000 on December 4, 1997. Carson submitted a declaration in which he stated, based on his personal knowledge as the disbursing agent for the deal, that Cassin paid $400,000 for the Falcon. However, Cassin's insurance application stated that the purchase price was $600,000.

Cassin and the Intervenors contend that the purchase price of the Falcon was in fact $600,000, or, in the alternative, that there is a genuine issue of material fact regarding the purchase price. They concede that the $400,000 was the only monetary consideration that flowed from Cassin to Falk to obtain title to the Falcon, but claim that Falk ceded Cassin a $200,000 equity in the Falcon of his own free will, thereby increasing the purchase price. As proof that this equity transfer increased the purchase

price, Cassin and the Intervenors reference a "Purchase and Sale Agreement" dated November 4, 1997, listing the purchase price as $600,000, but indicating that $200,000 would come from Cassin's purported existing equity in the vessel.

The Court is unpersuaded by this explanation. The term "purchase price" is defined in Black's Law Dictionary as "price agreed upon as consideration for which property is sold and purchased." BLACK'S LAW DICTIONARY (4th ed. 1968).[2] The term "price" is defined as "[t]he amount of money or other consideration asked for or given in exchange for something else." BLACK'S LAW DICTIONARY (8th ed. 2004). The term "sale" is defined as "[t]he transfer of property or title for a price." *Id.* Thus, property is "sold" when it or its title have been transferred for money or other consideration. The term "purchase" is defined as "[t]he act or an instance of buying." *Id.*

Here, the only consideration Falk accepted in exchange for transferring the Falcon to Cassin was the $400,000. The $200,000 in existing equity that Cassin claims in the Falcon is at best a benefit that flowed from Falk to Cassin. The undisputed facts reveal that Cassin paid nothing for that benefit.

 Accordingly, the Court concludes that Cassin has failed to offer any specific facts that place in dispute that the amount paid for the Falcon was anything more than $400,000. The Court also concludes that Cassin misstated the purchase price on the application when he stated that the purchase price was $600,000.

## D. The Materiality of Cassin's Statement

The Court must next consider whether Cassin's statement about the purchase price was "material." *American Home Assurance Co.*, 423 F. Supp. 2d at 221; *see also HIH Marine Services*, 211 F.3d at 1363 ("Under *uberrimae fidei*, a material misrepresentation on an application for marine insurance is grounds for voiding the policy."). "To be material, the fact must be something which would have controlled the underwriter's decision to accept the risk." *Knight*, 804 F.2d at 13 (citations and quotations omitted). In making this determination, "[a] marine insurer's specific inquiry about a fact is usually sufficient to

---

[2] The term "purchase price" is not defined in the latest edition of Black's Law Dictionary. *See* BLACK'S LAW DICTIONARY (8th ed. 2004).

establish materiality as a matter of law." *N.H. Ins. Co.*, 406 F. Supp. 2d at 1083 (citing *Pac. Ins. Co. v. Kent*, 120 F. Supp. 2d 1205, 1212 (C.D. Ca. 2000)) (applying California law).[3] "When an application specifically asks for the purchase price of a boat, the purchase price is 'unquestionably a fact material to the risk.'" *Id.* at 1084 (citing *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222 (9th Cir. 1995) (holding that a marine insured was entitled to void a policy under the doctrine of *uberrimae fidei* where the insurance applicant represented the "present market value" of a vessel when the applicant specifically asked for the purchase price)).

In this case, the insurance application specifically asked about the purchase price of the Falcon. Furthermore, to explain the significance of the purchase price amount to its insurance decision, AGF submitted the declarations of Stephen Bishop ("Bishop"), an underwriter with AGF from 1994 to 2002, and Beric Anthony Usher ("Usher"), a Managing Director and Senior Underwriter with TL Dallas. Bishop and Usher stated that, under the arrangement between AGF and TL Dallas, AGF would only consider insuring vessels valued in excess of $500,000. Bishop explained that the purchase price is a critical factor in determining the value. Usher stated that if Cassin's application had listed the purchase price as $400,000, but sought $600,000 in coverage, he would not have passed it on to AGF unless he received significant evidence showing that at least $200,000 in improvements had been made after the purchase, or that Cassin had received an extraordinary bargain when he purchased the vessel. Likewise, Bishop stated that he would have denied Cassin's application under these circumstances unless one of the above justifications for the difference between the purchase price and coverage amount was shown to his satisfaction. Indeed, the undisputed facts reveal that AGF actually relied on Cassin's statement regarding the amount of the purchase price in determining whether or not to issue the Policy.

 The Court is persuaded that the purchase price on the application was material to AGF's decision to insure the Falcon. Accordingly, Cassin's representation that the purchase price was $600,000 when only

---

[3] "California law and federal admiralty law are 'materially the same' on the issue of rescission [of a marine insurance contract] for misrepresentation or concealment ... ." *N.H. Ins. Co.*, 406 F. Supp. 2d at 1083 (citing *Montford*, 52 F.3d at 222 n.1).

$400,000 was paid for the Falcon, was a breach the duty of *uberrimae fidei*.

## E. Status of the Intervenors

Finally, CIT argues that it may recover under the Policy despite Cassin's misrepresentations because it is covered by a standard mortgage clause. "A standard mortgage clause in an insurance policy constitutes an independent contract which shelters the mortgagee's interest from the acts or neglects of the insured." *Blakeslee v. Royal Ins. Co. of Am.*, 1995 U.S. Dist. LEXIS 3572 at *8 (S.D.N.Y. Mar. 22, 1995) (applying New York law).[4]

However, it is undisputed that the Policy does not contain a standard mortgage clause, and that the Intervenors are not mentioned in the Policy at all. Based on this evidence, the Court finds that the language in the Policy is capable of only one meaning: that the Intervenors are not covered under a standard mortgage clause. *See Creative Waste Mgmt, Inc. v. Capitol Envtl. Services, Inc.*, 458 F. Supp. 2d 178, 186 (S.D.N.Y. 2006) (explaining that, under New York law, when contract is unambiguous, courts must determine the contract's meaning from terms expressed in instrument itself).[5]

Even if the Court were to consider this evidence, it would be insufficient to create a genuine issue of material fact necessary to stave off summary judgment. It is undisputed that the "binder page" was issued by Cassin's agent, Theodore Tunick ("Tunick"), not by AGF. Moreover, AGF has set forth evidence that neither AGF nor TL Dallas ever authorized Tunick to issue any document or make any representation on

---

[4] As explained in section II. D., *supra*, New York law applies to this issue because there is no general federal rule governing contract interpretation of marine insurance policies. *Cf. Morrow Crane Co. v. Affiliated FM Ins. Co.*, 885 F.2d 612, 614 (9th Cir. 1989) (using federal admiralty law to determine how to apply certain marine insurance policy provisions where there was an established federal rule concerning the application of the specific provisions at issue).

[5] CIT urges the Court to examine the "binder page" of the Policy wherein CIT is labeled as "an additional interest," arguing that this language shows that CIT is covered by a standard mortgage clause. However, the "binder page" is not part of the Policy and cannot be considered by the Court when a contract has a definite and precise meaning on its face. See *Devito v. Hempstead China Shop*, 38 F.3d 651, 654 (2d Cir. 1994) (noting that courts may only consider extrinsic evidence in interpreting a contract when the contract is ambiguous).

behalf of AGF that would give either Intervenor any direct interest in the policy.

Accordingly, Cassin's breach of the duty of *uberrimae fidei* prevents the Intervenors from recovering under the Policy.

## IV. CONCLUSION

Because there are no material facts in dispute and AGF is entitled to judgment as a matter of law, the Court will grant the motion for summary judgment. An appropriate judgment follows.