

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-29-2008

# AGF Marine Aviation v. Cassin

Precedential or Non-Precedential: Precedential

Docket No. 07-1640

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"AGF Marine Aviation v. Cassin" (2008). *2008 Decisions.* Paper 431.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/431

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 07-1640, 07-1641

AGF MARINE AVIATION & TRANSPORT

v.

RICHARD C. CASSIN

CIT GROUP/SALES FINANCING, INC.; UNITED STATES
OF AMERICA SMALL BUSINESS ADMINISTRATION,

Intervenor-Defendants
in District Court

Richard C. Cassin,

Appellant in 07-1640

CIT Group/Sales Financing, Inc.,

Appellant in 07-1641

-1-

On Appeal from the District Court
for the Virgin Islands
(No. 01-cv-00049)
District Judge: Honorable Curtis V. Gomez

Argued May 5, 2008

Before: RENDELL, FUENTES, and CHAGARES,
<u>Circuit Judges</u>

(Opinion Filed: September 29, 2008)

Gregory H. Hodges, Esq. (Argued)
Dudley, Topper & Feuerzeig
P.O. Box 756, 1A Fredericksberg Gade
Charlotte Amalie, St. Thomas
USVI, 00804-0000

Counsel for AGF Marine Aviation Transport

Kevin F. D'Amour, Esq.(Argued)
Ogletree, Deakins, Nash, Smoak & Stewart
P.O. Box 10829
Charlotte Amalie, St. Thomas
USVI, 00801-0000

Counsel for Richard C. Cassin

Alexandra L. Bartsch, Esq. (Argued)
205 Follen Road
Lexington, MA 02421

Carol G. Hurst, Esq.
5150 Dronningens Gade, Suite 4
Charlotte Amalie, St. Thomas
USVI

<u>Counsel for CIT Group/Sales Financing, Inc.</u>

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>:

Richard Cassin filed a claim for insurance with AGF Marine Aviation & Transport ("AGF") after his 85-foot charter yacht (the "Yacht") sank off the coast of Grenada. Upon reviewing the claim, AGF discovered that Cassin misrepresented the purchase price of the Yacht and sought a declaration from the District Court for the Virgin Islands that Cassin's insurance policy was void from its inception. The District Court granted summary judgment in favor of AGF, applying the federal maritime doctrine of *uberrimae fidei*, which requires that an insured exercise the utmost good faith and disclose to the insurer all facts material to an insurance risk. In this appeal we must determine whether *uberrimae fidei* applies

to the insurance policy issued to Cassin, and whether Cassin made a material misrepresentation that voided that policy. We will resolve both issues in the affirmative, and will therefore affirm the District Court's dismissal.

**I.**

Because our decision is based on the representation of the purchase price that Cassin made at the time he financed and insured the Yacht, we begin with a detailed description of those transactions. In late 1996 or early 1997, Magnus Falk placed the Yacht on the market for sale with Southern Trades Yacht & Ship Brokers ("Southern Trades"). Thereafter, the Yacht was advertised in various boating magazines for $450,000. Cassin contacted Robert Carson, the owner of Southern Trades, and expressed interest in purchasing the Yacht. It is undisputed that, at closing in December 1997, Falk received $400,000 from Cassin for the sale of the Yacht.

Nevertheless, Cassin represented that the purchase price for the Yacht was $600,000 in his application for financing to purchase the Yacht, and in later applications to insure the Yacht. In August 1997, several months before the purchase, Cassin applied for financing from Trident Funding Corporation ("Trident"). In a letter to Trident, Cassin acknowledged that Falk would only receive $400,000 at closing, but nevertheless requested financing for "80% of the $600K purchase price," or $480,000. App. 189. He explained that in 1995 (two years before Falk listed the Yacht for sale with Southern Trades), he acquired a one-third interest in the Yacht from Falk, his "friend and business partner." App. 189. A "down payment of $120,000" for the purchase of the Yacht, Cassin wrote, "will

-4-

come out of [his] existing share of the boat ($200K)." Id. Finally, "[a]t closing, Magnus Falk will receive $400,000 less Bob Carson's 10% commission on the $400K, and I will receive $80,000 to recapture the remainder of my equity." Id. Trident eventually agreed to finance $400,000 of the purchase price.

After the initiation of this action, and in response to an interrogatory from AGF, Cassin provided a different account of his negotiations for the Yacht. He stated that "[a]ll negotiations for purchase of the vessel were conducted by Mr. Bob Carson of Southern Trades. . . . I never had a direct conversation with Mr. Falk or communicated personally with him in any way until after the purchase transaction was completed." App. 186. In addition, contrary to his representations to Trident that he acquired the equity in 1995, Cassin stated that the equity was assigned as "part of the Purchase Agreement which Mr. Falk agreed to and signed before witnesses. It was a component of the deal." App. 187. To explain the transfer of the $200,000 equity, Cassin stated that "[i]t was my understanding from Mr. Carson that Mr. Falk had agreed to cede me a $200K equity in the vessel in order to be able to net $400,000 from its sale." App. 186. In response to a different interrogatory asking for an explanation for the $200,000 equity, Cassin stated "I was not given any 'reason(s)' why Mr. Falk agreed to assign us a $200,000 equity position in the yacht." App. 187.

The deal between Cassin and Falk for purchase of the Yacht closed on December 4, 1997. Thereafter, Cassin insured the Yacht from December 1997 through March 2000 on three successive insurance policies, each time for approximately $600,000. None of these policies were with AGF, the plaintiff in this case. On March 30, 2000, Theodore Tunick & Company

-5-

("Tunick") sent Cassin a letter indicating that his insurance policy was about to end, and offering a "renewal indication" which listed certain terms for a new insurance policy. App. 241.[1] The renewal indication stated that the policy form would be "TLD/4/COM," which is the insurance policy that Cassin ultimately received from AGF.[2] Id. The letter from Tunick also stated that "form TLD/4/COM contains certain limitations and exclusions . . . . A full copy of the policy form is available upon request." Id. Cassin completed an application for renewal on March 30, 2000, and submitted it to Tunick. On the application, in the space requesting "Purchase Price," Cassin wrote "$600,000." App. 150. Tunick then submitted the application to TL Dallas, an underwriting agent. TL Dallas presented the application to AGF on April 4, 2000, and AGF bound coverage to Cassin for the Yacht from April 1, 2000 to April 1, 2001.

Two months later, on June 5, 2000, Cassin received a three-page insurance binder ("Binder") from Tunick, in which AGF is listed as "Company" and Tunick is listed as "Producer." App. 306. The Binder included the following statement at the top of the front page: "**THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT TO THE CONDITIONS SHOWN ON THE REVERSE SIDE**." App. 306 (emphasis in original). On the reverse side, in a section

---

[1]The parties dispute whether Tunick was Cassin's agent or AGF's agent. We need not resolve this dispute to dispose of the case.

[2]While Tunick contacted Cassin to renew his insurance, AGF had never before insured Cassin or the Yacht.

entitled "Conditions," the Binder states that "[t]he Insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by the Company. . . . This binder is cancelled when replaced by a policy." App. 307. The Binder also makes one explicit reference to Citi Group/Sales Financing, Inc. ("CIT"), Trident's successor and a first priority lienholder on the vessel, listing it as a "Loss Payee." App. 308.[3] The Binder does not contain a choice of law provision.

Approximately five and a half months after AGF began insuring the Yacht, TL Dallas, on behalf of AGF, sent Tunick an insurance policy ("Policy") marked "TLD/4/COM," which was the form code specified in the March 30 renewal indication. App. 402-418. Tunick forwarded the Policy to Cassin on October 11, 2000, which was the first time that Cassin saw the Policy.

On November 5, 2000, the Yacht sank in 600 meters of water off the coast of Grenada after it allegedly collided with a semi-submerged container. Cassin subsequently filed a claim on the Policy. On March 7, 2001, after AGF investigated Cassin's claim, AGF filed the complaint in the present action, alleging that the Policy was void from its inception because Cassin misstated the purchase price in his original insurance application.

After extensive discovery by the parties, the District

---

[3]At the time the Yacht sank, it was securing debts to CIT ($390,000) and United States of America Small Business Administration ($170,000). Both creditors intervened in the District Court, but only CIT joined Cassin's appeal.

Court granted AGF's motion for summary judgment as to both Cassin and CIT. The District Court noted that under the Policy's choice of law provision, "any dispute arising [under the Policy] shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law," when they exist. AGF Marine Aviation & Transport v. Cassin, No. 2001-49, 2007 WL 309948, at *4 (D.V.I. January 22, 2007). Next, the District Court concluded that the doctrine of *uberrimae fidei*, which "requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk," is an "entrenched federal precedent," and therefore applies to this dispute pursuant to the Policy's choice of law provision. Id. at *2, *4 (quoting HIH Marine Servs., Inc. v. Fraser, 211 F.3d 1359, 1362 (11th Cir. 2000)). Moreover, the District Court found that the purchase price for the Yacht was only $400,000, and that Cassin's statement to the contrary on the insurance application was a material misrepresentation in violation of *uberrimae fidei*, permitting AGF to void the Policy from its inception. Finally, the District Court determined that CIT could not recover under the Policy independently of Cassin.

Cassin and CIT appeal. They argue that the Policy, and its choice of law provision, do not apply to this dispute; that *uberrimae fidei* is not firmly entrenched federal admiralty law; and that this Court must remand for a trial under Virgin Islands law, which does not apply the doctrine of *uberrimae fidei* to marine insurance disputes. In addition, CIT argues that it is an additional insured under the policy, permitting it to recover regardless of whether Cassin breached the duty of utmost good faith.

The District Court had subject matter jurisdiction pursuant to 48 U.S.C. § 1612(a), which provides the District Court of the Virgin Islands with the same jurisdiction as district courts of the United States.  In <u>New England Mut. Marine Ins. v. Dunham</u>, 78 U.S. 1 (1870), the Supreme Court recognized marine insurance contracts as within the federal courts' maritime jurisdiction.  <u>See also</u> <u>Wilburn Boat Co. v. Fireman's Fund Ins. Co.</u>, 348 U.S. 310, 313 (1955) ("Since the insurance policy here sued on is a maritime contract the Admiralty Clause of the Constitution brings it within federal jurisdiction.").

The District Court granted the plaintiff's motion for summary judgment, which was a final judgment; thus, we have jurisdiction pursuant to 28 U.S.C. § 1291.  For the following reasons, we will affirm the District Court's dismissal.

## II.

Cassin and CIT argue that at the time the Yacht sank the Binder, and not the Policy, was in effect.[4]  Contrary to Cassin and CIT's contentions, we conclude that the Policy was in effect

---

[4]Because the Binder did not have a choice of law provision, if it were in effect we would follow the choice of law analysis set forth by the Supreme Court in Wilburn Boat; that is, we would apply well established principles of federal admiralty law to resolve this dispute, but if none existed, we would apply state law as the federal rule of decision.  348 U.S. at 313; Calhoun v. Yamaha Motor Corp., 40 F.3d 622, 628 (3d Cir. 1994).  As discussed in greater detail below, the first step of the Wilburn Boat analysis, determining whether there is a well established principle of federal admiralty law that controls the dispute, is mirrored in the choice of law provision contained in the Policy eventually issued to Cassin: "It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law."  App. 411. Hence, it is the second part of the Wilburn Boat analysis that differs from the Policy's choice of law provision.  While the Policy selects New York law as the federal rule of decision absent applicable federal admiralty law, the appellants contend that we would apply Virgin Islands law under the Wilburn Boat analysis.  Importantly, the appellants contend that Virgin Islands law is favorable to them, because to void a policy under Virgin Islands law, an insurance company must show that the insured not only made a material misrepresentation, but *intended* to make the misrepresentation.

-10-

at the time the Yacht sank.

As described above, Cassin applied for insurance on March 30, 1997, to begin two days later on April 1, 1997. On April 4, 1997, AGF bound coverage for Cassin. As described in the Binder that Cassin received on June 5, the Binder was a temporary agreement, "subject to the terms, conditions and limitations of the policy(ies) in current use by the Company," and was "cancelled when replaced by a policy." App. 307. Hence, the Binder issued to Cassin signaled an intent to conform with the textbook understanding of a binder as "[a] temporary contract of insurance . . . intended to give the applicant protection pending the execution and delivery of a formal written policy." 16 Richard A. Lord, Williston on Contracts § 49:53, at 428 (4th ed. 2000); id. at 431 ("The binder overcomes the general rule that there is no coverage without the issuance of a policy."); 1A Lee R. Russ & Thomas F. Segalia, Couch on Insurance 3d § 13:1, at 13-2 (1995) ("[I]nsurance companies often issue a 'binder,' also called 'temporary' or 'preliminary' insurance, upon application for insurance or payment of the first premium, which covers the applicant until the insurance company's investigation of his or her insurability can be completed and a policy issued or the risk refused."). As an interim contract, a binder does not necessarily include all of the terms of an agreement to insure; rather, "the legal rights and duties of the contracting parties that are not covered by the provisions of the binder, or otherwise, must be determined by an inspection of the terms of the written policy which the parties expected would be issued." Williston § 49:53, at 429; Couch § 13:8, at 13-20 ("[T]erms not specified in the binder are, under ordinary circumstances, to be found in the policy, particularly where the application or binder incorporates such terms by

-11-

reference.").

Tunick's March 4 letter to Cassin advised that "coverage form TLD/4/COM contains certain limitations and exclusions" and that a "full copy of the policy form is available upon request." App. 241. The Binder explicitly warned that it was "subject to the terms, conditions and limitations of the policy(ies) in current use by the Company." App. 307. Moreover, the traditional understanding regarding the formation of contracts to insure is consistent with both the March 4 letter and the Binder. Yet neither Cassin nor CIT ever requested to see AGF's standard insurance policies. Under these circumstances, we conclude that the Binder was replaced by the Policy, which was issued in accordance therewith.

Cassin and CIT argue that the Policy could not replace the Binder in this case because the Policy was not issued until September or October 1997, five to six months after coverage began. However, we conclude that the time between issuance of the Binder and the Policy, which was explicitly contemplated in the Binder, did not render the Policy inapplicable. The appellants also argue that the Policy conflicts with the Binder, because the Policy contains a choice of law provision and the Binder does not. We disagree. The absence of a choice of law provision in the Binder does not create an inconsistency. In fact, the Binder signaled that there would be provisions in the Policy that were not explicit in the Binder. See Couch § 13:8, at 13-20 (noting that a binder "merge[s] in the terms and conditions of the written policy issued in accordance therewith"). Therefore, the Policy, and its choice of law provision, was in effect at the

time the Yacht sank, and governs this dispute.[5]

### III.

The Insurance Policy's choice of law provision stated:

> It is hereby agreed that any dispute arising
> hereunder shall be adjudicated according to well
> established, entrenched principles and precedents
> of substantive United States Federal Admiralty
> law and practice but where no such well
> established, entrenched precedent exists, this
> insuring agreement is subject to the substantive
> laws of the state of New York.

App. 411. The plain language of this provision requires that we determine whether there are any entrenched principles of admiralty law that would control the dispute. The relevant principle to consider is *uberrimae fidei*.

The doctrine of *uberrimae fidei* imposes a duty of the utmost good faith and requires that parties to an insurance contract disclose all facts material to the risk. If an insured

---

[5]CIT argues that because it never received notice of the Policy, which was sent only to Cassin, the changes effected therein cannot apply to CIT. It references the "Evidence of Property Insurance" form prepared the day after the Binder, which labels CIT a "Loss Payee" and indicates that CIT would be notified "of any changes to the policy." App. 309. However, as we conclude that the Policy is consistent with the Binder, no notification was required.

-13-

defaults on this duty, the contract may be avoided by the insurer. See Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc., 518 F.3d 645, 648 (9th Cir. 2008); HIH Marine Servs., 211 F.3d at 1363; Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986). A party's intent to conceal, or lack thereof, is irrelevant to the *uberrimae fidei* analysis. See Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 695 (11th Cir. 1984) (holding that a material misrepresentation, even if it is a result of "mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void") (internal quotation marks omitted). The only thing that matters is the existence of a material misrepresentation.

The Policy's choice of law provision mandates that we look to "well established, entrenched principles and precedents of substantive United States Federal Admiralty law." App. 411. Yet, as we mentioned above in footnote 4, we see no difference between this mandate and the analysis we would undertake pursuant to Wilburn Boat in the absence of a choice of law provision. See Wilburn Boat, 348 U.S. at 313 (noting that even if a contract dispute falls under this Court's admiralty jurisdiction, "it does not follow . . . that every term in every maritime contract can only be controlled by some federally defined admiralty rule"); Calhoun, 40 F.3d at 627-28 (discussing Wilburn Boat and comparing the relationship between state and federal law in admiralty cases to their relationship in preemption cases such as Clearfield Trust Co. v. United States, 318 U.S. 363 (1943), and its progeny).[6]

---

[6]While we have not evaluated how to determine when a rule is "judicially established" so as to be the rule of decision,

We have previously held, in a case decided after Wilburn Boat, that "in the maritime context a boat owner must meet its duty of *uberrimae [fidei]*." East Coast Tender Serv., Inc. v. Robert T. Winzinger, Inc., 759 F.2d 280, 284 n.3 (3d Cir. 1985) (concluding that while *uberrimae fidei* is applicable, the insured's "behavior is consistent with the notion of 'utmost good faith'"). The majority of our sister circuits to decide the issue are in agreement that *uberrimae fidei* controls in maritime insurance disputes. See Puritan Ins. Co., 779 F.2d at 870 (2d Cir.) ("It is well established that the parties to a marine insurance contract are held to the highest degree of good faith[,] *uberrimae fidei*."); Inlet Fisheries, 518 F.3d at 654 (9th Cir.) ("Following the framework of Wilburn Boat, we hold that the longstanding federal maritime doctrine of *uberrimae fidei*, rather than state law, applies to marine insurance contracts."); HIH Marine Servs., 211 F.3d at 1362 (11th Cir.) ("It is well-settled

Wilburn Boat, 348 U.S. at 314, other Circuits have. The Ninth Circuit requires that a "rule be sufficiently longstanding and accepted within admiralty law that it can be said to be 'established.'" Inlet Fisheries, 518 F.3d at 650. The Fifth Circuit requires the admiralty rule to be "entrenched federal precedent." Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 888 (5th Cir. 1991). Meanwhile, the Second Circuit looks to whether the rule is "well established," Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985), and the Eleventh Circuit determines whether the rule is "well settled," Steelmet, Inc., 747 F.2d at 695. While these Circuits might differ somewhat on the precise language they use, the idea behind the analysis is consistent, and directs what we must do in the present dispute.

-15-

that the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit.").

Meanwhile, the First Circuit has questioned whether *uberrimae fidei* is well established, but has declined to decide the issue. See Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 38 (1st Cir. 2006) (declining to decide issue, because even under state law, the facts of the case made the policy voidable); Windsor Mt. Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir. 1995) (declining to decide issue, because even under *uberrimae fidei*, the insurer would not be able to avoid the policy).

The Fifth Circuit is the only circuit to disavow the doctrine of *uberrimae fidei* as "not 'entrenched federal precedent.'" Anh Thi Kieu, 927 F.2d at 889. In Anh Thi Kieu, the Fifth Circuit reversed the course it had taken in previous cases. See Fireman's Fund Ins. Co. v. Wilburn Boat Co., 300 F.2d 631, 647 n.12 (5th Cir. 1962) (declaring that *uberrimae fidei* "is solidly entrenched in our body of federal maritime law"). Despite a lengthy exposition of the history of the doctrine of *uberrimae fidei*, going back 200 years, the opinion concluded that recent application had been "spotty" and *uberrimae fidei* "is entrenched no more." Anh Thi Kieu, 927 F.2d at 889-90.

The Fifth Circuit's position has been criticized quite heavily, most recently by the Ninth Circuit in Inlet Fisheries. See 518 F.3d at 652-53. It also contradicts the general sentiment in scholarly literature. See Thomas J. Schoenbaum, Admiralty and Maritime Law 297 (4th ed. 2004); Graydon S. Staring & George L. Waddell, Marine Insurance, 73 Tul. L. Rev. 1619, 1651 (1999); Mitchell J. Popham & Chau Vo, Misrepresentation

and Concealment in Marine Insurance Contracts: An Analysis of Federal and State Law Within the Ninth Circuit, 11 U.S.F. Mar. L.J. 99, 108-12 (1998-1999); Thomas J. Schoenbaum, The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law, 29 J. Mar. L. & Com. 1, 11-13 (1998).

In the face of this general agreement regarding *uberrimae fidei*'s status as entrenched federal admiralty law, Cassin and CIT argue that the mere fact that there is a circuit split prevents a holding that *uberrimae fidei* is firmly entrenched. However, they fail to address the fact that our Circuit has already held that *uberrimae fidei* applies to maritime insurance contracts. See East Coast Tender Serv., 759 F.2d at 284 n.3. We reaffirm our prior precedent, and conclude that the doctrine of *uberrimae fidei* is well entrenched and therefore controls this dispute.

## IV.

Having determined that *uberrimae fidei* applies to the insurance policy issued to Cassin, we now determine whether Cassin made a material misrepresentation. Cassin argues that there are outstanding questions of fact regarding whether he misrepresented the purchase price, and if so, whether such a misrepresentation was material.

**A.**

The District Court concluded that Cassin failed "to offer any specific facts that place in dispute that the amount paid for the [Yacht] was anything more than $400,000." Cassin, 2007 WL 309948, at *5. In particular, the District Court relied on the fact that all involved parties concede that the only monetary value exchanged was $400,000. The District Court was unpersuaded by Cassin's argument that the purchase price included a $200,000 equity stake in the Yacht, which was "at best a benefit that flowed from Falk to Cassin" without consideration. Id. Therefore, the District Court held that Cassin misstated the purchase price.

Cassin and CIT concede that only $400,000 in monetary value was exchanged. But they insist that the purchase price was $600,000, because that is the price listed on the "Purchase and Sale Agreement." Appellant's Br. at 1. They also point to surveys from 1997 and 1998, which valued the Yacht at $600,000.[7]

We are unpersuaded by the appellants' arguments. The record does not contain any deed transferring the $200,000 equity stake from Falk to Cassin. Moreover, Cassin's explanations regarding the equity transfer are so incompatible with one another that no reasonable juror could conclude that the $200,000 equity was ever transferred to Cassin. Cassin told Trident, months before the Purchase and Sale Agreement was signed, that he already had a $200,000 stake in the Yacht. In

---

[7]There is no survey in the record from 2000, the year AGF insured the Yacht.

fact, he represented that he acquired the equity in 1995, two years before he applied for financing.  The $200,000 equity in the boat, according to Cassin, was transferred irrespective of the ultimate sale of the Yacht.  Yet in response to interrogatories, Cassin argued that Falk transferred $200,000 in equity as part of the Purchase and Sale Agreement.  Cassin struggled to explain what consideration was exchanged for the equity.  He suggested in one interrogatory that the equity allowed Falk to earn $400,000 on the boat, which we take to mean that the market value for the boat was only $400,000.  In response to another question, he stated that no reason was provided.

We agree with the District Court that the evidence in the record leaves no question as to the dubious nature of the $200,000 equity and that the purchase price was $400,000. Cassin misrepresented the purchase price to Trident in his application for financing and has continued to misrepresent the purchase price.

**B.**

We still must determine whether that misrepresentation was material.  The question of materiality must be viewed from the perspective of a reasonable person in the insured's position. See Knight, 804 F.2d at 13.  The Second Circuit has defined material facts in the *uberrimae fidei* context as "something which would have controlled the underwriter's decision to accept the risk."   Id. at 13 (citations and quotation marks omitted).  The Ninth Circuit has held more broadly that "[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law."  Freeman v. Allstate Life Ins. Co., 253 F.3d 533, 536 (9th Cir. 2001) (citation

-19-

omitted); see also N.H. Ins. Co. v. C'Est Moi, Inc., 519 F.3d 937, 939 (9th Cir. 2008). Black's Law Dictionary, meanwhile, defines "material" as "of such a nature that knowledge of the item would affect a person's decision-making; significant; essential." Black's Law Dictionary 998 (8th ed. 2004); see also L. Buglass, Marine Insurance and General Average in the United States 24 (2d ed. 1981) (stating that a material fact is one that "would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk").

We believe that the Knight definition of materiality is too narrow. A fact need not "control" an underwriter's decision to be material, as the term is usually understood. On the other hand, we conclude that the Ninth Circuit's formulation is more broad than necessary to resolve this dispute. For example, the misrepresentation of an applicant's middle initial on a marine insurance application, without more, would not violate *uberrimae fidei*. Nevertheless, we are persuaded by the Ninth Circuit's more limited statement regarding purchase price: "The purchase price of a vessel 'is unquestionably a fact material to the risk,' as it provides an objective measure of the vessel's worth and the corresponding risk of insuring the vessel." C'Est Moi, Inc., 519 F.3d at 939 (quoting Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222 (9th Cir. 1995)).

Cassin and CIT contend that the value of the Yacht is a much more important indicator of the insurance risk, and two appraisals valued the Yacht at $600,000. However, those appraisals were from 1997 and 1998, two years before AGF began insuring the Yacht. More importantly, while a Yacht's valuation may entail subjective considerations, the "purchase price . . . can be presumed to be objective because it was arrived

-20-

at through arm's length negotiations between parties with opposing interests." C'Est Moi, Inc., 519 F.3d at 940. We conclude that when a marine insurer asks for the purchase price, it is a fact material to the risk, the misrepresentation of which violates *uberrimae fidei*. As Cassin misrepresented the purchase price of the Yacht, the Policy was voidable *ab initio*, relieving AGF of the duty to satisfy Cassin's claim.[8]

## V.

Finally, CIT argues that it may recover under the Policy despite Cassin's misrepresentation.[9] CIT conceded at oral argument that under New York law a loss payee is not protected independently of the insured, absent a clause to that effect in an insurance policy.[10] See Wometco Home Theatre, Inc. v.

---

[8]Cassin suggests that AGF should be prohibited from benefitting from *uberrimae fidei* because it acted in bad faith by returning Cassin's premiums after the Yacht sank, "in a deceptive attempt to void [the] policy." Appellant's Br. 27. While *uberrimae fidei* requires the utmost good faith on the part of both insured and insurer, the record makes clear that AGF did not breach that duty. AGF explicitly disclosed its intention to void the Policy in its complaint, filed March 7, 2001, before the return of any premiums.

[9]The parties agree that there is no well established federal admiralty principle governing this issue. Therefore, pursuant to the choice of law provision, we will apply New York law.

[10]CIT argues that it was an "additional insured" under the Binder. However, the Binder explicitly categorizes CIT as a

-21-

<u>Lumbermens Mut. Cas. Co.</u>, 97 A.D.2d 715, 716 (N.Y. App. Div. 1983) ("In the absence of a provision that the insurance policy shall not be invalidated by any act or neglect of the insured, a 'loss payee' is not itself an insured under the policy; it is merely the designated person to whom the loss is to be paid. It is established that such a loss payee may only recover if the insured could have recovered." (citations omitted)). CIT also conceded that there is no such clause in the Policy. Because we conclude that the Policy was in effect at the time the Yacht sank, and that CIT was at best a loss payee under the insurance policy, it follows that CIT cannot recover under the Policy independently of Cassin. We will therefore affirm the District Court's dismissal of CIT's claims.

## VI.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of AGF.

---

"Loss Payee." <u>See</u> App. 308. A document prepared the day after the Binder, entitled "Evidence of Property Insurance," also explicitly categorizes CIT as "Loss Payee." <u>See</u> App. 309. While the first page of the Binder has a checked box next to "Additional Insured," CIT is not listed in the space provided. Rather, CIT is unambiguously listed as a "Loss Payee."